JON A. ST. PIERRE,
        *Plaintiff*,

    v.                                            No. 3:14-cv-01866 (VAB)

TAWANNA *et al.*,
        *Defendants*.

## RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jon A. St. Pierre ("Plaintiff"), incarcerated at Osborn Correctional Institute in Somers, Connecticut, has sued current and former employees of Correctional Managed Health Care ("CMHC") and the University of Connecticut Managed Health Care Center ("UConn Health") under 42 U.S.C. § 1983. Specifically, Mr. St. Pierre alleges violations of rights guaranteed to him under the First and Eight Amendments to the U.S. Constitution and asserts claims of medical malpractice under Connecticut State law.[1]

The incidents at issue allegedly took place while Mr. St. Pierre was incarcerated at Corrigan-Radgowski Correctional Center ("Corrigan") and MacDougall-Walker Correctional Institute ("MacDougall"). He seeks declaratory and injunctive relief and money damages.

Defendants have moved for summary judgment.

For the following reasons, the motion is **GRANTED**.

---

[1] At the outset, the Court notes the work of appointed counsel, Kenneth A. Votre. Mr. Votre came into this case, after it had been on the docket for some time, and has devoted considerable time and effort on Mr. St. Pierre's behalf.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. St. Pierre alleges that Samuel Berkowitz, DPM, and Vinayak Sathe, MD, who were been affiliated with UConn Health, deprived him of adequate medical treatment resulting in cruel and unusual punishment in violation of the Eighth Amendment. He also asserts that Kym Martin, RN, Heidi Greene, RN, and Tawanna Furtick, RN,[2] who are or once were affiliated with CMHC, similarly deprived him of adequate medical treatment as well as retaliated against him for filing grievances against medical staff at UConn Health and CMHC.

## A. Factual Allegations

The initial injury allegedly occurred in March 2012, while Mr. St. Pierre was incarcerated at Garner Correctional Institution ("Garner"). Sec. Am. Compl. ¶ 12. Inmates at Garner are allegedly required to keep their property in foot lockers. *Id.* ¶ 13. The foot lockers, allegedly made of heavy steel, are opened by pulling the steel door down towards the floor. *Id.* ¶ 14. While Mr. St. Pierre was retrieving a bag of coffee from the foot locker, the cover allegedly came down on his left foot, injuring his foot and toes. *Id.* ¶ 13. Specifically, the foot locker door allegedly clamped down and "blew his toenail off and crushed his toe." *Id.* ¶ 16.

### 1. Samuel Berkowitz, DPM

Mr. Berkowitz, a doctor of podiatric medicine, is currently an Assistant Professor in the Department of Orthopedic Surgery at the University of Connecticut Medical School. Pl.'s SMF ¶ 1.

On March 21, 2012, Mr. Berkowitz treated Mr. St. Pierre, because Mr. St. Pierre had allegedly injured his right foot.[3] *Id.* ¶ 4. He testified that, after examining Mr. St. Pierre's right

---

[2] The Complaint refers to Nurse Furtick solely as Tawanna.

[3] On January 4, 2012, Dr. Berkowitz examined a painful bunion on Mr. St. Pierre's left foot. Pl.'s SMF ¶ 2. Dr. Berkowitz diagnosed Mr. St. Pierre with hallux-valgus with osteoarthritis. *Id.* He

foot, he diagnosed Mr. St. Pierre with a contusion and a possible fractured toe. *Id.* ¶ 4. Dr.

Berkowitz ordered an x-ray of Mr. St. Pierre's toes. *Id.* Dr. Berkowitz testified that Mr. St.

Pierre's toes were dressed with Band-Aids and antibiotic ointment to be re-applied daily for five

days, and Dr. Berkowitz ordered a shower shoe for Mr. St. Pierre. *Id.* Mr. St. Pierre contends,

however, that he sought treatment for an injury to his left foot. *Id.*

According to Dr. Berkowitz, a radiologist interpreted the x-ray he ordered, *id.* ¶ 5, and

found "[n]o acute bony or join space injury" in Mr. St. Pierre's "[r]right great toe." Castro

Report, Def.'s SMF, Ex. 6 at 4, ECF No. 105. In light of this finding, Dr. Berkowitz thought no

further care was necessary. Defs.' SMF ¶ 5.

On May 2, 2012, Dr. Berkowitz again saw Mr. St. Pierre. Pl.'s SMF ¶ 6. Mr. St. Pierre

then complained of pain from the bunion on his left foot. *Id.* Dr. Berkowitz again advised him

that he should wear shoes with a wider toe box, and counseled against surgery. *Id.*

In early June 2012, a nurse treated Mr. St. Pierre's right big toe for an infection and

provided him with warm compresses and antibiotics. *Id.* ¶ 7. Dr. Glassman,[4] a podiatrist,

removed the medial edge of Mr. St. Pierre's right big toe nail to cure the infection which had not

responded to antibiotics. *Id.* ¶ 8. Mr. St. Pierre's believed that some nail edge remained at the

surgical sight of his right big toe, and saw Dr. Berkowitz on June 13, 2012. *Id.* ¶ 9. Dr.

Berkowitz removed the remaining portion of the in-grown nail. *Id.*

---

advised Mr. St. Pierre against surgical intervention, having determined that surgery was
unnecessary and the condition could be treated by wearing shoes with a wider toe box. *Id.* Dr.
Berkowitz noted that surgery may provide benefits, but that surgery also carried with it potential
risks. *Id.* ¶ 3.

[4] A number of individuals in this cases are referenced solely by a surname throughout the record.
The Court will refer to such individuals accordingly.

On July 31, 2012, Dr. Valletta saw Mr. St. Pierre due to complaints about an in-grown toenail of the right third toe. *Id.* ¶ 10. Dr. Valletta prescribed an antifungal cream and antibiotics to treat the infection. *Id.* The following day, Dr. Berkowitz removed the in-grown toenail. *Id.* ¶ 11.

Dr. Berkowitz saw Mr. St. Pierre on October 3, 2012, and cut the nail edge of an in-grown nail on Mr. St. Pierre's left big toe. *Id.* ¶ 12. Dr. Berkowitz also saw Mr. St. Pierre on various other occasions during his incarceration and provided him with medical care, as did UCHC and CMHC medical professionals. *Id.* ¶ 13.

### 2. Vinayak Sathe, MD

Dr. Vinayak Sathe, a medical doctor, is currently an Assistant Professor in orthopedic surgery at the University of Connecticut Health Center and specializes in foot and ankle surgery. Pl.'s SMF ¶ 15.

Dr. Sathe has performed several surgeries on Mr. St. Pierre at the Health Center, the first on September 5, 2013. *Id.* ¶¶ 16–17. This surgery was to correct a bunion on Mr. St. Pierre's left big toe that would alleviate pain Mr. St. Pierre had reported experiencing, correct the deformity, and correct a mild hammer toe on his left second toe, if necessary. *Id.* ¶ 17.

In advance of the surgery, Dr. Sathe explained the procedure to Mr. St. Pierre, including its risks and benefits, and obtained his consent to perform "first metatarsal corrective osteotomy plus modified McBride release, osteotomy of the proximal phalanx plus any related procedures plus second hammertoe correction."[5] *Id.* ¶ 18.

---

[5] Osteotomy is the "dividing of a bone, or the excision of part of it." Random House Webster's Unabridged Dictionary 1371 (2d ed. 2001).

Dr. Sathe testified that, during surgery, he operated according to medical standards for a surgery of its kind. *Id.* ¶ 19. Dr. Sathe opined that, after completing the procedures, he examined the left big and second toes and determined that Mr. St. Pierre would not require any additional procedures during the surgery, which would have included an osteotomy in the second bone of his left big toe and tendon release in his left second toe. *Id.* ¶ 20. Mr. St. Pierre, however, contends that Dr. Sathe removed the wrong side of his bone during surgery, exacerbating the condition and Mr. St. Pierre's pain. St. Pierre Aff. ¶¶ 29–31. The experience, Mr. St. Pierre testified, left him using crutches for several months. *Id.* ¶ 31.

On May 1, 2014, Dr. Sathe performed a second surgery. Sathe Aff. ¶ 11. This surgery was due to a mild return of the bunion on Mr. St. Pierre's left big toe, a hammer toe of his left second toe, and pain Mr. St. Pierre attributed to the screw Dr. Sathe affixed in his big toe during the first surgery. *Id.* ¶ 11. Mr. St. Pierre maintains that Dr. Sathe informed Mr. St. Pierre that he would perform surgery to Mr. St. Pierre's left foot to correct for the first surgery. St. Pierre Aff. ¶ 39.

Dr. Sathe testified that, in advance of the second surgery, he explained to Mr. St. Pierre the risks and benefits of undergoing the surgery. Defs.' SMF ¶ 24. By way of a written authorization form, Mr. St. Pierre allegedly consented to a "first metatarsal corrective osteotomy plus modified McBride release, plus akin's osteotomy plus second hammertoe corrective plus any related procedure." Sathe Aff. ¶ 12. Mr. Sathe opined that the surgery proceeded as planned and was effective in correcting the deformities at issue. Defs.' SMF ¶ 27. Mr. St. Pierre asserts that his foot ailments persisted. Pl.'s SMF ¶ 27.

Dr. Sathe performed a third surgery on November 13, 2014. Defs.' SMF ¶ 28. Dr. Sathe explained that Mr. St. Pierre's left, second toe was "cocked up" and required remedial surgery.

Sathe Aff. ¶ 16. Before this surgery, Dr. Sathe explained to Mr. St. Pierre the risks and benefits of surgery, and Mr. St. Pierre, by written authorization, consented to the left foot second hammertoe correction plus second metatarsal osteotomy plus fusion of the toe plus any related procedure. Pl.'s SMF ¶ 29. Dr. Sathe testified that he explained to Mr. St. Pierre that this procedure on his left second toe had a higher likelihood of failure due to a congenital deformity of his left, second toe and due to scaring from the previous surgery. Defs.' SMF ¶ 30. Mr. St. Pierre, for his part, asserts that this third surgery was to correct for "damage done" during the first two surgeries that Dr. Sathe had performed. St. Pierre Aff. ¶ 41. He further claims that the third surgery was "problematic" because of the intervening time since the two earlier surgeries and a "deterioration" of his medical condition. St. Pierre Aff. ¶ 42.

Dr. Sathe opined that the third surgery proceeded according to plan and was effective in correcting the targeted deformity in Mr. St. Pierre's left second toe. Defs.' SMP ¶ 32. Mr. St. Pierre maintains that it was during this surgery that he suffered nerve damage to his foot, "causing it to become deformed." St. Pierre Aff. ¶¶ 42–43.

Dr. Sathe testified that bunion surgery and hammertoe correction can be effective in alleviating pain, but there is always a likelihood of reoccurrence. Pl.'s SMF ¶ 34. Although Mr. St. Pierre experienced some reoccurrence of his deformity, Dr. Sathe opined that he was satisfied with each surgery and considered them to be effective. Defs.' SMF ¶ 36.

### 3.     Kym Martin, RN

Kym Martin is a registered nurse. Pl.'s SMF ¶ 39. She previously worked for CMHC as a correctional nurse and was assigned to Corrigan-Radgowski Correctional Center from 2008 until 2015 to provide medical care to inmates. *Id.* ¶¶ 40–41.

Nurse Martin saw Mr. St. Pierre on September 7, 2013, after he was admitted to the infirmary at Corrigan. Pl.'s SMF ¶ 41. After she entered his cell, the door closed, and Mr. St. Pierre, who was lying in bed at the time not near the door, yelled a profanity at Nurse Martin and accused her of hurting his foot. *Id.* Nurse Martin said she was confused given that the bed, and Mr. St. Pierre in it, were not positioned near the door. *Id.* She administered Tylenol No. 3 to him as he requested. *Id.*

Nurse Martin testified that she saw Mr. St. Pierre on October 5, 2015, noting that he rested in bed, with his eyes closed, most of the night. *Id.* ¶ 42. She provided him with two tablets of Tylenol No. 3 at 5:45 a.m., and, after following up with him later, determined that the medication was effective. *Id.*

Mr. St. Pierre testified that, the following day, Nurse Martin entered his cell to deliver breakfast. St. Pierre Aff. ¶ 57. Although she placed his cellmate's food tray on the table, she allegedly dropped his tray on the floor and said to him that, if he did not stop writing grievances, she was going to make his life "a living hell." St. Pierre Aff. ¶ 57. He claims that Nurse Martin threatened to allege that Mr. St. Pierre "flashed" her as a way to rid her of him for alleged sexual harassment, as she allegedly had done to someone else. *Id.* ¶ 58. Mr. St. Pierre testified that these statements made him nervous and afraid that Nurse Martin may actually take action against him. *Id.* ¶ 59. Mr. St. Pierre filed a petition against Nurse Martin with the Connecticut Department of Public Health, which was ultimately dismissed. Pl.'s SMF ¶ 45. Mr. St. Pierre claims that Nurse Martin has a reputation for "setting up" inmates and fabricating disciplinary reports. St. Pierre Aff. ¶ 56.

Records indicate that Nurse Martin saw Mr. St. Pierre on various other occasions to provide him with medication, including Tylenol No. 3 and Percocet, at his request. Pl.'s SMF ¶

43. Nurse Martin denies that she ever threatened him, dropped his food tray, or withheld medical care from Mr. St. Pierre. *Id.* She claims to have acted professionally at all times and to have provided Mr. St. Pierre with adequate medical care and medications as ordered by the doctor. Martin Aff. ¶ 10.

### 4. Heidi Greene, RN

Heidi Greene is currently a nursing supervisor for CMHC and assigned to MacDougall. Greene Aff. ¶ 2, Defs.' SMF, Ex. 5, ECF No. 103-7. From October 2008 to March 2015, she was a correctional nurse assigned to MacDougall. *Id.* ¶ 3. Her duties principally included staffing, scheduling, supervising nurses, evaluating staff, and touring the facility. Pl.'s SMF ¶ 48.

On May 1, 2014, Mr. St. Pierre returned to MacDougall from surgery. *Id.* ¶ 49. The on-call physician ordered five milligrams of Oxycodone every six hours, if needed, for three days and a bottle of Tylenol for pain management. *Id.* On May 4, 2014, Dr. Pillai ordered five milligrams of Oxycodone every eight hours for three days. *Id.* ¶ 50. Three days later, the on-call physician saw Mr. St. Pierre and ordered an immediate two-tablet dose of Oxycodone and five milligrams, three times daily, for four days and twice daily for two days to follow. *Id.* ¶ 51. Mr. St. Pierre's medical records indicate that he was administered Oxycodone from May 1, 2014, through May 9, 2014, as prescribed. Def.'s SMF ¶ 52. Mr. St. Pierre contends that he received pain medication as prescribed on two days only; on the other days, Nurse Greene allegedly administered Motrin. St. Pierre Aff. ¶ 71.

Nurse Greene testified that, on May 9, 2014, at 4:30 p.m., she received a call from the CMHC pharmacy director to inform her that nurses were removing medication from the medication electronic storage dispenser without proper authorization. Pl.'s SMF ¶ 53. Nurse Greene explained that she spoke with the on-call physician, Dr. LaPlante, at approximately 4:50

p.m. that day, and he discontinued the oxycodone and prescribed Motrin to Mr. St. Pierre. Greene Aff. ¶ 13. According to Mr. St. Pierre's medical chart, Mr. St. Pierre's oxycodone prescription "[did] not meet CMHC policy and med should be changed." May 9, 2014, Notation at 24, Def.'s SMF, Ex. 6, ECF No. 105. The note further details that Nurse Greene called "on call MD + informed of above + noted APAP sensitivity. N.O. obtained for Motrin. Pharmacy nurse notified." *Id.* Nurse Greene explained that Mr. St. Pierre's Oxycodone prescription was prescribed without the requisite non-formulary authorization—a CMHC physician can only prescribe a non-formulary medication by submitting a non-formulary request to the CMHC medical director approval. Greene Aff. ¶ 11. Nurse Greene testified that Mr. St. Pierre refused the Motrin. *Id.*

Mr. St. Pierre counters by stating that Nurse Greene refused to provide him with post-operative pain medication as prescribed. St. Pierre Aff. ¶ 65. Mr. St. Pierre alleges he informed a doctor of this, and the doctor confirmed the prescription and stated that he did not know why Nurse Greene was refusing him medication *Id.* ¶¶ 68–69. The doctor allegedly said he would speak with Nurse Greene. *Id.* ¶ 73. Mr. St. Pierre claims that he filed several grievances against Nurse Greene for refusing him medical treatment. *Id.* ¶¶ 72, 75.

On May 11, 2014, Dr. Naqvi saw Mr. St. Pierre and prescribed Oxycodone. Pl.'s SMF ¶ 56. Mr. St. Pierre's medical records indicate that he received Oxycodone on May 11 and 12, 2014. Greene Aff. ¶ 15. Mr. St. Pierre claims that he was not administered medication on these dates.

On May 12, 2014, at 7:00 p.m., the pharmacy director contacted Nurse Greene to notify her that Mr. St. Pierre's Oxycodone prescription was again written without a non-formulary request and was unauthorized. Pl.'s SMF ¶ 58. The pharmacy director instructed her to contact

the on-call physician for instruction. *Id.* Nurse Green spoke with on-call physician Dr. Freston at 7:30 p.m. on May 12, 2014. *Id.* ¶ 59. Dr. Freston discontinued the Oxycodone and prescribed sixty milligrams of Toradol. *Id.*

Nurse Greene then spoke with Mr. St. Pierre to discuss his medication. *Id.* ¶ 60. She reviewed his previous sick calls and prescriptions, which included Tylenol, Motrin, Naproxen, and Toradol, which are all the same class of non-steroidal anti-inflammatory drugs. Greene Aff. ¶¶ 18, 20. Mr. St. Pierre alleges that Nurse Greene informed him that Toradol does not contain Motrin; he claims the Toradol Nurse Greene administered caused him to be sick and break out in a rash. St. Pierre Aff. ¶¶ 84–86. Nurse Greene, for her part, claims that Mr. St. Pierre informed her that he may be allergic to Motrin and said that he had small red spots on his neck and arm but he was taking Motrin and eating peanut butter and was not sure what had caused the spots. Greene Aff. ¶ 19. Nurse Green did not herself observe any spots on him. *Id.*

Ms. Greene testified that Mr. St. Pierre informed her that he had an outstanding administrative remedy with respect to a surgery, a response to which he had to yet to receive. Greene Aff. ¶ 22. Ms. Greene claimed that she followed up with the administrative remedies coordinator and passed along Mr. St. Pierre's concerns. *Id.* She testified that Mr. St. Pierre never stated that any of the administrative remedies were with respect to her. Defs.' SMF ¶ 68. Mr. St. Pierre contends that he discussed with Nurse Greene his multiple grievances against her. St. Pierre Aff. ¶ 78.

### 5.  Tawanna Furtick, RN

Tawanna Furtick is a registered nurse and currently a supervisor for CMHC and assigned to MacDougall. Pl.'s SMF ¶ 70. During the relevant time period, she worked at MacDougall. *Id.* ¶ 71.

On July 15, 2014, Nurse Furtick saw Mr. St. Pierre to address complaints of pain in his right foot. *Id.* ¶ 73. She evaluated him, changed the dressing on his foot, and referred him to a medical doctor. *Id.* She saw him again the following day for a scheduled dressing change. *Id.* ¶ 74. Mr. St. Pierre asked her about an approval pending with the utilization review committee ("URC"). *Id.* She changed the dressing and referred him to the URC nurse. *Id.*

On July 26, 2014, she saw Mr. St. Pierre again, after another nurse had inadvertently administered to him another inmate's medication. *Id.* ¶ 75. She contacted the on-call doctor for instructions on taking his vital signs. *Id.* ¶ 75. She again saw him on December 5, 2014, for swelling of his left foot. *Id.* ¶ 76. She changed the dressing on his foot and took his vital signs. *Id.* She administered medication to him—*e.g.* Oxycodone, Neuronton, Tylenol, Bactrim, and Keflex—on numerous occasions and claims not to have withheld medication from him. *Id.* ¶¶ 77–78. Nurse Furtick believes that she provided him with adequate medical care and acted at all times professionally. *Id.* ¶¶ 81–82.

Nurse Furtick served as the health service remedies coordinator at MacDougall from approximately 2011 until 2015. *Id.* ¶ 79. She testified, and Mr. St. Pierre does not contest, that she did not personally respond to or deny any of Mr. St. Pierre's administrative remedies during her tenure as coordinator. Furtick Aff. ¶ 13, Defs.' SMF, Ex. 5, ECF No. 103-7.

### B.     Procedural Background

On December 12, 2014, Mr. St. Pierre, proceeding *pro se*, filed this lawsuit, ECF No. 1, and subsequently filed an Amended Complaint, ECF No. 39. This remains the operative Complaint.

Mr. St. Pierre initially sued various officials and officers employed by the Connecticut State Department of Correction under 42 U.S.C §§ 1983, 1985, and 1986, alleging violations of

the First and Eighth Amendments and asserting negligence and medical malpractice under Connecticut State law.

Upon initial review under 28 U.S.C. § 1915A(b), the Court permitted the Section 1983 claims of retaliation to proceed against defendants Nurses Martin, Furtick, and Greene and the deliberate indifference to medical needs as well as the state law claims of negligence and medical malpractice to proceed against Nurses Greene, Furtick, and Martin and Drs. Berkawitz and Sathe in their individual and official capacities. ECF No. 12. All other claims were dismissed.

The Court subsequently appointed counsel to represent Mr. St. Pierre *pro bono*. ECF No. 60.

Defendants moved to dismiss. ECF No. 50. The Court dismissed Mr. St. Pierre's negligence claims in their entirety and dismissed Mr. St. Pierre's medical malpractice claims as to Defendants in their official capacities. His personal capacity medical malpractice claims were allowed to proceed. ECF No. 80.

The parties engaged in factual discovery on Mr. St. Pierre's (1) First Amendment claims of retaliation against Nurses Martin, Furtick, and Greene; (2) Eighth Amendment claims of deliberate indifference to serious medical needs against Nurses Martin, Greene, Furtick and Drs. Berkowitz and Sathe; and (3) medical malpractice claims against Nurses Martin, Greene, Furtick and Drs. Berkowitz and Sathe. All claims are against Defendants in their personal capacities.

Defendants now move for summary judgment. ECF No. 103. The Court heard oral argument on August 9, 2018. ECF No. 119.

## II.      STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to

create genuine issue of material fact.'") (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

## III.    DISCUSSION

Defendants argue that Mr. St. Pierre cannot demonstrate any genuine issues of material fact exist as to whether Drs. Sathe and Berkowitz and Nurses Greene, Martin, and Furtick acted with deliberate indifference to his serious medical needs. Defs.' Br. at 16. They also argue that Mr. St. Pierre cannot establish by admissible evidence unlawful retaliation under the First Amendment as against Nurses Greene, Martin, and Furtick. *Id.* at 21. Defendants assert immunity from suit under the doctrine of qualified immunity more broadly, *id.* at 26, and that Mr. St. Pierre's medical malpractice claims are barred by statutory immunity under Section 4-165(a) of the Connecticut General Statutes, *id.* at 30. With respect to the state law claims, Defendants argue that, should Mr. St. Pierre's federal claims fail to withstand summary judgment, the Court should decline to exercise supplemental jurisdiction over Mr. St. Pierre's medical malpractice claims.

Mr. St. Pierre argues that, through Mr. St. Pierre's testimony, he has carried his burden with respect to his deliberate indifference claim. *See, e.g.*, Pl.'s Opp'n Br. at 9 (citing Mr. St. Pierre's affidavit). He argues that there are genuinely disputed issues of material fact as to whether Nurses Martin, Greene, and Furtick unlawfully retaliated against him. *Id.* at 11. Finally, Mr. St. Pierre argues that Defendants have misapplied Connecticut law with respect to his medical malpractice claim. Pl.'s Opp'n Br. at 5. He asserts that where the conduct at issue was "wanton, reckless or malicious," as he alleges it was here, no further process is necessary for a viable medical malpractice claim. *Id.* The Court disagrees.

### A. Deliberate Indifference

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend VIII. This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner plaintiff must prove "deliberate indifference to [the plaintiff's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The standard of deliberate indifference includes both subjective and objective components. "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

#### 1. Objective

The objective, "'medical need' element measures the severity of the alleged deprivation" of medical care. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003) (citations omitted). In assessing the objective prong, the Court must determine (a) "whether the prisoner was actually deprived of adequate medical care," and (b) "whether the inadequacy in medical care is sufficiently serious" to constitute a constitutional violation. *Salahuddin*, 467 F.3d at 279–80. These inquiries are highly fact-specific. *See Smith*, 316 F.3d at 185 (citation omitted).

##### a. Inadequate Medical Care

The Second Circuit has explained that:

> [T]he Supreme Court has noted [that] the prison official's duty is only to provide reasonable care. Thus prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

*Salahuddin*, 467 F.3d at 279–80 (citations and internal quotation marks omitted). Accordingly, a plaintiff must establish that he was denied reasonable care or "reasonable measures" in response to a medical condition.

### i.     Dr. Berkowitz

Mr. St. Pierre argues that Dr. Berkowitz has deprived him of adequate medical care by misdiagnosing his injuries and routinely refusing to re-evaluate the injury to his foot. Pl.'s Opp'n Br. at 9. He claims that, during his first visit with Dr. Berkowitz, Dr. Berkowitz concluded that he did not have a fracture and that the injury would heal without medical intervention. *Id.* Mr. St. Pierre further claims that he filed grievances asking to have his injuries re-examined but was not seen. He claims that he has frequently asked for medical attention and it was denied.

The record, however, does not support these claims. Defendants have submitted medical records that show that, after Dr. Berkowitz treated Mr. St. Pierre in March 2012, Dr. Berkowitz treated him again in May, June, July, and October of 2012 for ailments related to his foot. Mr. St. Pierre does not refute these medical records or Dr. Berkowitz's testimony as to their veracity; rather, Mr. St. Pierre asserts generally that, despite his many requests, he was denied further treatment for what he alleges was a misdiagnosed injury to his toe.

Mr. St. Pierre maintains that he should have been treated more frequently or more expeditiously than he was. In support of the argument, he relies on the alleged submission of multiple complaints and grievances seeking treatment, but has produced no evidence suggesting his toe was, in fact, broken or otherwise required further treatment.

Indeed, he cites a petition for a writ of *habeas corpus* filed in state court to order the DOC to provide him with his desired surgery. St. Pierre Aff. ¶ 17. This filing, however, is not of sufficient probative value on whether Dr. Berkowitz failed "to take reasonable measures in

response to [Mr. St. Pierre's] medical condition." *Salahuddin*, 467 F.3d at 280. Even if it had sufficient probative value, this filing would not be admissible evidence at trial because any probative value would be substantially outweighed by its potential to mislead or unduly prejudice the jury. *Cf. Vermont Mut. Ins. Co. v. Ciccone*, No. 3:09-cv-00445 (VAB), 2015 WL 4094174, at *3 (D. Conn. July 7, 2015) (finding that the probative evidence of personal injuries would be outweighed by the dangers of unfair prejudice or misleading the jury on the question of whether an employer-employee relationship existed (citing Fed. R. Evid. 403)).

Just as importantly, Mr. St. Pierre has failed to establish, through admissible evidence, the baseline standard of medical care that Dr. Berkowitz allegedly breached. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Bryant v. Wright*, 451 Fed. App'x 12, 14 (2d Cir. 2011) (affirming the trial court's dismissal for failure to state a claim where the complaint acknowledges that prison doctors were "trying to stop" the medical issue, the plaintiff had received treatment, and that allegations that the treatments had so far been unsuccessful); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *see also Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) (providing that "expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person"); *Gold v. Dalkon Shield Claimants Trust*, No. B–82–cv–383, 1998 WL 351456, at *3 (D. Conn. June 15, 1998) ("Expert testimony is required when the factual content of the underlying issues is not found within the layperson's common knowledge and experience."); *Zuchowicz v. United States*, 870 F. Supp. 15, 19 (D. Conn. 1994) (requiring that testimony satisfy admissibility standards set by

Federal Rules of Evidence 702 and 104 and in order for it to properly assist the trier of fact in determining medical causation).

Absent credible testimony regarding Mr. St. Pierre's alleged medical issue, his mere disagreement with prison officials about what constitutes appropriate care does not rise to the level of a constitutional violation. *Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Mr. St. Pierre thus has failed to rebut the presumption of validity afforded to the judgment of prison doctors, because, again, he has not offered any evidence of "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Nails v. Laplante*, 596 F. Supp. 2d 475, 480 (D. Conn. 2009) (citing *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990)). It is well-settled that "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

Mr. St. Pierre's suggestion, that Dr. Berkowitz's treatment was a departure from accepted professional judgment because of the alleged diagnosis of an unnamed doctor who examined him before Dr. Berkowitz, does not create a genuine disputed issue. This purported evidence fails in at least two ways. First, it is hearsay and not admissible evidence. *See Lewis v. Town of Waterford*, 239 F.R.D. 57, 60 (D. Conn. 2006) (noting that a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial" (quoting *Nyack v. S. Connecticut State Univ.*, 424 F. Supp. 2d 370, 374 (D. Conn. 2006))); *cf. Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296, 314 (D. Conn. 2016) (declining to admit into evidence hearsay statements where the plaintiff was

unable to show that the proffered statements fell within an exception to the hearsay rule). Second, even if it was not hearsay, this testimony alone would only be probative of the state of Mr. St. Pierre's foot at the time of his injury, but would not be sufficiently probative, without being unduly prejudicial, of the medical care subsequently provided by Dr. Berkowitz. *Cf. Ciccone*, No. 3:09-cv-00445 (VAB), 2015 WL 4094174, at *3 (finding that the probative evidence of personal injuries would be outweighed by the dangers of unfair prejudice or misleading the jury on the question of whether an employer-employee relationship existed (citing Fed. R. Evid. 403)). The Court need not credit these conclusory allegations. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (providing that a court may disregard conclusory allegations at the summary judgment stage).

The Supreme Court has made plain that what treatment or whether a prison doctor should have provided treatment "is a classic example of a matter for medical judgment," and does not represent cruel and unusual punishment. *Estelle*, 429 U.S. at 107. Mr. St. Pierre's personal opinion about the appropriateness of his treatment therefore surely cannot give rise to a cognizable Eighth Amendment claim.

Mr. St. Pierre thus has failed to provide the admissible evidence necessary to create a genuine issue as to whether Dr. Berkowitz deprived him of adequate medical care. A lay juror then has no basis to judge whether Dr. Berkowitz should have seen Mr. St. Pierre more than he did; whether Dr. Berkowitz was appropriately addressing the issues about which Mr. St. Pierre complained; whether other actions should have been taken; whether the records that were taken were sufficiently detailed; whether x-rays would have revealed the particular injury at issue; whether Dr. Berkowitz, through his action or inaction, caused "unreasonable delay" given the

injury alleged; whether there was probative evidence that Dr. Berkowitz understood the alleged severity of the injury; and whether he appropriately relied on data available to him, for example.

After reviewing the record, Mr. St. Pierre has failed to "set forth specific facts showing that there is a genuine issue for trial" as to whether Dr. Berkowitz deprived him of reasonable medical care. *Anderson*, 477 U.S. at 248. Summary judgment therefore is granted on Mr. St. Pierre's deliberate indifference claim as to Dr. Berkowitz.

### ii.    Dr. Sathe

Mr. St. Pierre argues that the three surgeries performed by Dr. Sathe deprived him of adequate medical care. He asserts that the September 2013 surgery was improper, only partial, and that Dr. Sathe removed the wrong side of the bone, exacerbating Mr. St. Pierre's condition. Pl.'s Opp'n. Br. at 15. He claims that despite two addition surgeries to "correct" the earlier one, each surgery left him in more pain and the final surgery resulted in nerve damage and left his foot "deformed." *Id.*

As discussed above, Mr. St. Pierre's claim against Dr. Sathe fails as a matter of law because he fails to offer an evidentiary basis to support the claim. Other than a mere conclusion, he provides no foundation for the proposition that Dr. Sathe was under a duty to perform a surgery he failed to perform; neither does Mr. St. Pierre provide a basis for how he would know, the internal workings of the human foot or how treat its abnormalities, and what can cause enduring trauma to the foot. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Tindal v. Goord*, 340 Fed. App'x 12, 13 (2d Cir. 2009) (affirming dismissal of the plaintiff's deliberate indifference claim where the plaintiff did not deny treatment on various occasions); *Jones v. Vives*, 523 Fed. App'x 48, 50 (2d Cir. 2013) (affirming dismissal where the plaintiff relied on the fact that the prison

doctor initially prescribed Motrin to relieve the plaintiff's pain and did not order an x-ray of the plaintiff's hand until several days later, finding this was a matter of "medical judgment"). As the Second Circuit held in *Barnes v. Anderson*, 202 F.3d 150 (2d Cir. 1999), "expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person," *id.* at 159; *see also Gold*, 1998 WL 351456, at *3 ("Expert testimony is required when the factual content of the underlying issues is not found within the layperson's common knowledge and experience.").

Mr. St. Pierre therefore has failed to raise a triable issue as to whether Doctor Sathe acted with deliberate indifference to Mr. St. Pierre's serious medical needs, and judgment is granted accordingly.

### iii.    Nurse Martin

Although Mr. St. Pierre states that there remain genuinely disputed issues of material fact as to whether Nurse Martin was deliberately indifferent to his serious medical needs, Mr. St. Pierre fails to offer "specific facts" supported by admissible evidence of a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *accord Brown*, 654 F.3d at 358 (providing that a court may disregard conclusory allegations at the summary judgment stage); St. Pierre Aff. ¶ ("I complained that Martin had been intentionally inflicting pain upon me by refusing to provide me with medical care.").

Summary judgment therefore is granted on Mr. St. Pierre's deliberate indifference claim as to Nurse Martin.

### iv.         Nurse Greene

Mr. St. Pierre argues that there are genuinely disputed issues of material facts as to whether Nurse Greene deprived him of appropriate medical care by denying him "his prescribed pain medication." Pl.'s Opp'n Br. at 15. The Court agrees.

Defendants have offered evidence that shows that, between May 1 and May 4, 2014, various doctors, not including Drs. Berkowitz and Sathe, prescribed Oxycodone to Mr. St. Pierre for pain management. Mr. St. Pierre's medical records indicate that he was administered Oxycodone from May 1, 2014, through May 9, 2014, as prescribed. Nurse Greene explained that, on May 9, 2014, the on-call physician discontinued the Oxycodone and prescribed Motrin to Mr. St. Pierre. According to Mr. St. Pierre's medical chart, Mr. St. Pierre's Oxycodone prescription did not meet CMHC policy would need to be changed. Nurse Greene explained that Mr. St. Pierre's Oxycodone prescription was prescribed without the requisite non-formulary authorization—a CMHC physician can only prescribe a non-formulary medication by submitting a non-formulary request to the CMHC medical director approval. Defendant, however, has failed to provide any record evidence probative of a CMHC policy that speaks to how non-formulary medications must be prescribed and that such a policy, if one exists, requires revoking a prescription without first considering the needs of the inmate.

Mr. St. Pierre counters that, on at least two occasions, Nurse Greene refused to provide him with post-operative pain medication as prescribed. Mr. St. Pierre alleges he informed another doctor of this refusal. He claims to have filed several grievances against Nurse Greene for refusing to administer Oxycodone as prescribed. He also testified that Nurse Greene asked Mr. St. Pierre whether he was going to drop his grievances, and when he declined to do so because he continued to experience severe pain, he claims she took him off the prescribed

medication, effective immediately. Even assuming there is a CMHC policy that would have required that Mr. St. Pierre's Oxycodone prescription be revoked, the evidence, when viewed in Mr. St. Pierre's favor, to which he is entitled as the party opposing summary judgment, demonstrates the existence of a genuine issue of material fact as to whether Nurse Greene deprived him of adequate medical care.

### v.      Nurse Furtick

Mr. St. Pierre argues that there are genuine issues of material fact as to whether Nurse Furtick deprived him of adequate medical care. Nurse Furtick has testified that she administered Mr. St. Pierre's medication as prescribed and never withheld medication from him. Mr. St. Pierre, for his part, argues that Nurse Furtick denied the various grievances seeking an administrative remedy regarding the treatment he was seeking for his foot. But Mr. St. Pierre has failed to demonstrate how Nurse Furtick allegedly denying him an administrative remedy is probative of an alleged failure on her part to provide him with adequate medical care, and Mr. St. Pierre has admitted that Nurse Furtick never denied him medication as prescribed.

Having drawn all inferences in favor of Mr. St. Pierre, the Court finds that no reasonable trier of fact could find in his favor and Nurse Furtick is entitled to judgment as a matter of law. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (requiring the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial*," lest judgment should enter as a matter of law) (citation omitted)).

### b.      Sufficiently Serious

The Court must now "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280 (citation omitted). For an ailment to qualify as sufficiently serious, typically, the Eighth Amendment contemplates

"'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance*, 143 F.3d at 702. In determining the severity of the medical need, the Court reviews a variety of factors, including but not limited to whether the impairment is one that a reasonable doctor or patient would find important and worthy to treat, whether the condition affects the daily activities of an individual, and whether the condition is accompanied by chronic and substantial pain. *Id.* at 702–03 (citations omitted). It may also consider "the absence [or type] of adverse medical effects or demonstrable physical injury" as well as any unreasonable and very likely risk of future harm, even if physical harm is not currently present. *Smith*, 316 F.3d at 187–88 (citations omitted).

Mr. St. Pierre argues that Nurse Greene deprived him of adequate medical care. To state a deliberate indifference claim, he must also show through credible evidence that the resulting harm Mr. St. Pierre suffered was sufficiently serious. *See Chance*, 143 F.3d at 702 (requiring "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"). Here, his claim fails as a matter of law.

Mr. St. Pierre testified that, when asked by Nurse Greene whether he would withdraw his grievance, he said he was "was still experiencing severe pain and discomfort" and thus would not withdraw his requests for an administrative remedy. St. Pierre Aff. ¶ 79. Mr. St. Pierre has also testified that, on two occasions, after he complained to an on-call doctor that Nurse Greene refused to administer his medication as prescribed, instead administering Motrin, the doctor found it appropriate to re-prescribe Oxycodone to him.

Although there is no dispute that the underlying condition of which Mr. St. Pierre suffers is sufficiently serious, the record evidence, taken as true, demonstrates a temporary delay or interruption in otherwise adequate medical treatment, at least as it relates to Mr. St. Pierre's pain management, of those conditions that last "several" days. St. Pierre Aff. ¶ 67; *see also Smith v.*

*Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) ("Where a prisoner plaintiff is receiving appropriate on-going treatment for his condition, but, instead brings a narrower denial of medical care claim based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner.") (citing *Estelle*, 429 U.S. at 106).

Assuming, without deciding, that Mr. St. Pierre's pain, absent intervention, could produce serious complications if left untreated, *cf. Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (noting that a dental cavity is a "degenerative condition" that, if left untreated indefinitely, will likely to produce "agony and to require more invasive and painful treatments"), there is no evidence in this record that Mr. St. Pierre's pain changed over the time he was administered Motrin, as opposed to receiving Oxycodone. *See Bilal v. White*, 494 Fed. App'x 143, 146 (2d Cir. 2012) (finding no evidence that the plaintiff's conditions—epilepsy and arthritis—worsened over time) (citing *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003) ("The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue.")).

Mr. St. Pierre's medical records demonstrate that he has taken a number of medications for pain management. But the only evidence that Mr. St. Pierre suffered "extreme pain" between the taking of Motrin and the resumption of a prescription to Oxycodone is his own testimony, "which does no more than to recite the phrase, without any indication of the duration, location, or nature of his pain. Furthermore, despite access through discovery to his complete medical records, [he] offered none of those records in opposition to summary judgment, and thus failed to corroborate his allegation with any details, beyond the [most general outline] of his medical

history, the severity of his [ ] suffering, or the medications he has been prescribed." *Bilal*, 494 Fed. App'x at 146.

The "mere recitation of the formula" that he suffered "extreme pain" thus falls short of raising a genuine issue of fact as to whether the delay of the pain medication was sufficiently serious to rise to the level of an Eighth Amendment violation. *Id.*

Viewing the record evidence in the light most favorable to Mr. St. Pierre, he has failed to produce evidence that would allow a reasonable juror to find that any Defendant acted with deliberate indifference to his serious medical needs. *Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017) ("The Court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion").

Summary judgment therefore is granted in Defendants' favor on Mr. St. Pierre's Eighth Amendment claim.

## B.    RETALIATION

Mr. St. Pierre also has alleged that Nurses Martin, Greene, and Furtick retaliated against him in response to him seeking an administrative remedy for medical care.

"Courts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks and citations omitted).

A plaintiff asserting a First Amendment retaliation claim must establish a *prima facie* case, *i.e.*: (1) the speech or conduct was protected; (2) the defendant took an adverse action against him; and (3) there was a causal connection between the adverse action and the protected

speech. *Id.* A plaintiff must also establish that the "defendants were aware of the protected activity." *Pavone v. Puglisi*, 353 Fed. Appx. 622, 625 (2d Cir. 2009). With respect to the last element, a plaintiff must show the "punishment was motivated, in whole or in part, by [the plaintiff's conduct—in other words, that the prison officials' actions were substantially improper retaliation." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In reaching a determination as to causation, it should weigh factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). To prevail on the claim, a plaintiff must also show by a preponderance of the evidence that the defendants were "personally involved—that is, [they] directly participated—in the alleged constitutional deprivations." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

Furthermore, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353. In making this determination, a court's inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

Once a plaintiff has proven there are genuine issues of material fact on all three of the elements of a retaliation action, the burden shifts to the defendant to prove that the plaintiff would have received the same treatment "even in the absence of the protected conduct."

*Graham*, 89 F.3d at 79 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Id.* (citations omitted). The Second Circuit has recognized that this defense is often appropriately applied in the context of prison administration. *Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984) (noting that a finding of sufficient proper reasons under *Mount Healthy* "is readily drawn in the context of prison administration where we have been cautioned to recognize that 'prison officials have broad administrative and discretionary authority over the institutions they manage'") (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983), *receded from on other grounds by Sandin v. Conner*, 515 U.S. 472, 481–84 (1995)).

Given the "particular care" with which prisoner retaliation claims are viewed, a plaintiff may rely on circumstantial evidence to prove their retaliation claims, such as temporal proximity of events, but in doing so, the plaintiff also must usually provide some non-conclusory evidence that raises an inference of "retaliatory animus" in order to proceed to trial. *Cf. Colon*, 58 F.3d at 873 (noting that the Court would not have granted summary judgment if the only evidence of retaliation had been plaintiff's good behavior and temporal proximity between the lawsuit and the disciplinary charges but plaintiff was entitled to a trial because he provided evidence that the disciplinary charge was based on false information); *see also Faulk v. Fisher*, 545 Fed. App'x 56, 58–59 (2d Cir. 2013) (affirming grant of summary judgment where plaintiff failed to provide any evidence, circumstantial or otherwise, of retaliatory intent); *Bennett v. Goord*, 343 F.3d at 138–39 (2d Cir.2003) (noting that direct evidence of retaliatory intent may not be required where the circumstantial evidence is "sufficiently compelling").

As a preliminary matter, Mr. St. Pierre argues that Nurses Furtick, Greene, and Martin have retaliated against him in violation of the First Amendment in his opposition memorandum. But his briefing lacks arguments, both factual and legal, with respect to these claims as they apply to Nurses Furtick or Greene. The Court is under no obligation to "review portions of the record in response to a motion, where the . . . opposition papers do not make specific reference to . . . the record." D. Conn. L. Civ. R. 7(a)(3); *see also Hubert v. Dep't of Corr.*, No. 3:17-CV-00248 (VAB), 2018 WL 3350334, at *3 (D. Conn. July 9, 2018) (declining to reconsider the plaintiff's continuing violation theory because she provided no citation to allegations in the complaint to support the theory); *Skyline Steel, LLC*, 101 F. Supp. 3d at 400  (requiring citation to record evidence on summary judgment) (citing *Novartis Corp*, 271 F.3d at 1046).[6] The Court therefore deems the claims as to Nurses Furtick and Greene abandoned. *See Paul v. Bank of Am., N.A.*, No. 3:11-cv-0081 (JCH), 2011 WL 5570789, at *2 (D. Conn. Nov. 16, 2011) (deeming the plaintiff's claim abandoned when the plaintiff failed to address it in opposition to summary judgment).

In any event, the Court will address the claims against all three nurses on the merits. All of these claims fail as a matter of law.

### 1.    Protected Speech

Mr. St. Pierre attests that he filed a number of grievances related to inadequate medical treatment of his foot. Mr. St. Pierre therefore has raised a genuine dispute as to whether he engaged in protected activity. *See Davis*, 320 F.3d at 352–53 ("[T]he filing of prison grievances

---

[6] Now represented by counsel, Mr. St. Pierre is no longer due the special solicitude afforded to *pro se* litigants in this Circuit. *See Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (recognizing that, once represented by counsel, a litigant may be "penalized by strict rules" of procedure).

is a constitutionally protected activity"); *McKethan v. New York State Dep't of Corr. Servs.*, No. 10 Civ. 3826 (NRB), 2011 WL 4357375, at *6 (S.D.N.Y. Sept. 16, 2011) ("There can be little doubt that [prisoner] plaintiff's informal complaints and formal grievances constitute protected activity under the First Amendment.") (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)).

### 2. Knowledge

#### a. Nurse Martin

Mr. St. Pierre testified that, in September 2013, he filed a grievance with the Connecticut Board of Examiners against Nurse Martin for what he described as her unprofessional manner. He explained that Nurse Martin had intentionally inflicted pain upon him by refusing to provide him with medical care. After noticing Nurse Martin staring and laughing at him on several occasions, Mr. St. Pierre testified that, in October 2013, Nurse Martin threatened him, saying: "If you don't stop the bullshit and writing grievances, I will make your life a living hell." St. Pierre Aff. ¶ 57. Although Nurse Martin disputes that she ever threatened him, Mr. St. Pierre has demonstrated a genuinely disputed issue of material fact as to Nurse Martin's knowledge of Mr. St. Pierre's grievance against her.

#### b. Nurse Furtick

The Court will assume, without deciding, that he has submitted evidence that would allow an inference that Nurse Furtick knew he had engaged in protected speech. *See, e.g.*, St. Pierre Aff. ¶ 33 ("All of the grievances were denied by Defendant Tawanna . . . .").

#### c. Nurse Greene

Mr. St. Pierre testified that he spoke with Nurse Greene about a grievance that he filed against her. It was during this conversation, he testified, that she asked him if he was going to drop his grievance, and he replied no. Nurse Greene has recognized that she and Mr. St. Pierre

discussed an outstanding request for an administrative remedy. Mr. St. Pierre thus has demonstrated a triable issue as to Nurse Greene's knowledge of Mr. St. Pierre having engaged in protected speech.

### 3.    Adverse Action

#### a.    Nurse Martin

Although Mr. St. Pierre has offered evidence sufficient to allow a reasonable juror to find that he had engaged in protected speech and that Nurse Martin knew of at least one grievance that he had filed against her, he has provided no evidence that any harm resulted from Nurse Martin's alleged threatening behavior. Mr. St. Pierre has explained that he feared that Nurse Martin would make false allegations against his as a form of reprisal, but notwithstanding these concerns, he continued to seek administrative remedies. By only asserting a single conclusory allegation that Nurse Martin continued to harass him, Mr. St. Pierre has not made clear what harm, if any, materialized as a result of Nurse Martin's alleged threat. *See Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004) (suggesting that, for purposes of Article III standing, a prisoner plaintiff asserting retaliation under § 1983 absent chilled behavior requires "some sort of harm," including, for example, placing a plaintiff in keeplock for a period of weeks).

Nurse Martin's alleged threat relating to Mr. St. Pierre's filing of grievances does not, on its own, amount to actionable harm. *See Bilal*, 494 Fed. App'x at 147 (finding that a prisoner plaintiff's claim of retaliation failed because the officer's comments about grievances in combination with the officer fabricating behavioral reports against the plaintiff and temporarily ignoring the plaintiff's requests for pain medication was not actionable) (citing *Davis*, 320 F.3d at 353 (stating that "disrespectful comments directed at an inmate generally do not rise to" level of retaliation). Summary judgment therefore is granted in favor of Nurse Martin.

### b.    Nurse Furtick

Mr. St. Pierre's retaliation claim against Nurse Furtick fails for a simple reason: absent allegedly chilling speech, Mr. St. Pierre has failed to provide any evidence of an adverse consequence other than Mr. St. Pierre's unsubstantiated claim that Nurse Furtick allegedly denied his medical grievances. *See Gill*, 389 F.3d at 383 (requiring "some sort of harm"). Mr. St. Pierre therefore has failed to raise a genuinely disputed issue as to Nurse Furtick causing him actionable harm and summary judgment is granted in favor of Nurse Furtick.

### c.    Nurse Greene

Finally, Mr. St. Pierre argues that Nurse Greene administered him Toradol instead of Oxydodone, causing him to become ill; his claim fails for lack of an adverse consequence.

Although Mr. St. Pierre has alleged that Nurse Greene informed him that she was taking him off Oxycodone, he does not dispute that the Oxycodone prescription was cancelled and re-written as a prescription for Toradol by someone other than Nurse Greene. Absent from the record is any evidence that Nurse Greene had the authority to write or modify prescriptions, so to the extent that Mr. St. Pierre claims that Nurse Greene retaliated solely by virtue of administering medication other than Oxycodone, there is no evidence that Nurse Greene can be fairly said to be "personally involved" in the alleged injury within the meaning of § 1983. *Gronowski*, 424 F.3d at 293.

Moreover, as discussed above, Mr. St. Pierre has proffered no evidence to suggest that the pain he experienced differed—qualitatively or quantitatively—while prescribed Oxycodone, as opposed to any other pain management medication. In fact, Mr. St. Pierre himself apparently concedes that his pain maintained some level of consistency across time. *See, e.g.*, St. Pierre Aff. ¶ 87 ("The following day came and went and I was not seen by a doctor despite the fact that I

was still experiencing a great amount of pain."). Mr. St. Pierre has testified that, on several occasions, after being taken off Oxycodone, he was re-prescribed the medication by the on-call physician, which could allow a reasonable juror to infer that anything less that Oxycodone was insufficient to manage Mr. St. Pierre's pain. But in the prison context, the Second Circuit has specially cautioned that a prisoner plaintiff must offer more than "circumstantial proof" to prevail on a First Amendment retaliation claim. *Colon*, 58 F.3d at 873; *see also Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996) (reversing the granting of summary judgment where the plaintiff offered evidence the plaintiff's version of events was corroborated by the testimony of seven other inmates, the plaintiff was able to provide the list inmates he had collected who would be willing to  represent other inmates in the grievance process, and prison officials were, after a search, unable to provide the alleged petition they say that the plaintiff was circulating in violation of a regulation barring the urging of a work slowdown or stoppage).

 To the extent that Mr. St. Pierre takes issue with what he may characterize as Nurse Greene's decision to administer Toradol notwithstanding Mr. St. Pierre's warning that he is allergic to Motrin, Nurse Greene testified that she consulted Mr. St. Pierre's records to ensure it was medically appropriate to administer the prescribed medication, and exercising her medical judgment decided to do so. In light of the record evidence, Mr. St. Pierre's conclusory allegation that he is "allergic" to Motrin is insufficient to create a genuine issue. Not only is Mr. St. Pierre's lay testimony insufficient to establish a medical diagnosis but it similarly cannot suffice to establish that the Toradol caused him to become ill. *See Barnes*, 202 F.3d at 159 (providing that "expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person").

Furthermore, despite access to his medical records through the discovery process, Mr. St. Pierre has done nothing more than baldly assert that he is allergic to Motrin and became ill, which he has also described in only the most elementary of terms, after being administered Toradol. *Colon*, 58 F.3d at 873 (indicating that, if "circumstantial evidence represented the sum total of [the plaintiff's] proof," in the context of a prisoner plaintiff's claim of retaliation under the First Amendment, summary judgment may be appropriate) (citation omitted); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("While mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case, caution should be exercised in granting summary judgment where state of mind is in issue or when the party opposing the motion has been denied relevant discovery." (internal quotation marks and citation omitted) (citing *Landmark Land Co. v. Sprague*, 701 F.2d 1065, 1070 (2d Cir. 1983)); *cf. Bilal*, 494 Fed. App'x at 146 (affirming summary judgment where the plaintiff, having had access to his medical records, failed to corroborate his testimony that otherwise was conclusory).

By way of example, Nurse Greene noted in Mr. St. Pierre's medical records that he has an "APAP sensitivity." May 9, 2014, Notation at 24. Mr. St. Pierre has made no effort whatsoever to bridge the evidentiary gap between a drug "sensitivity" and an "allergy" that would allow for a reasonable inference that a drug sensitivity can cause an allergic reaction. Neither has he established what an allergic reaction to Motrin typically looks like, whether the symptoms are severe, whether they persist over time or are progressive, or whether the physical manifestations of such an outbreak are generalizable in the first instance. Absent any such evidence, no reasonable juror could infer causation between Nurse Greene allegedly revoking his prescription to Oxycodone and Mr. St. Pierre falling ill from an allergic reaction to Motrin,

which he has acknowledged taking before without issue. *See, e.g.*, Pl.'s SMF ¶ 52 ("Nurse Green did not administer the pain medication as prescribed and Plaintiff was administered Motrin instead.").

Thus, even if Mr. St. Pierre could establish an adverse consequence other than through evidence of mere coincidence, and he cannot, he has offered no direct or "sufficiently compelling" evidentiary basis for an inference that harm resulted from Nurse Greene's administering of Toradol to him. *Bennett*, 343 F.3d at 139. Given that Mr. St. Pierre continued to file grievances, Nurse Greene's conduct, whether allegedly revoking Mr. St. Pierre's prescription to Oxycodone or administering Toradol, is not actionable. *See Gill*, 389 F.3d at 383 (requiring "some sort of harm" absent chilled speech).

When Mr. St. Pierre's allegations are taken in the light most favorable to him and examined with "skepticism and particular care," his claim of retaliation against Nurse Greene is insufficient to withstand summary judgment. *Baskerville*, 224 F. Supp. 2d at 733. Mr. St. Pierre has failed to raise a genuine issue for trial that Nurse Greene's retaliatory conduct worked an adverse consequence that, under these circumstances, would deter "a similarly situated individual of ordinary firmness" from engaging in protected speech, *Davis*, 320 F.3d at 353, and judgment therefore is granted in favor of Nurse Greene as a matter of law. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88 (requiring "the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial*," lest judgment should enter as a matter of law) (citation omitted)).

Having granted summary judgment in Defendants' favor on Mr. St. Pierre's claims under § 1983, the Court does not reach the issue of qualified immunity.

## C.    SUPPLEMENT JURISDICTION OVER STATE LAW CLAIMS

Mr. St. Pierre argues that Defendants engaged in medical malpractice under Connecticut law. Defendants argue that the Court should decline to exercise supplemental jurisdiction over the claim. The Court agrees.

Supplemental or pendant jurisdiction is a matter of discretion, not of right. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Where all federal claims have been dismissed before a trial, state claims generally should be dismissed without prejudice and left for resolution by the state courts. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ( "[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Because the Court has granted summary judgment on Mr. St. Pierre's federal claims, it declines to exercise supplemental jurisdiction over his remaining state law claims. *See, e.g.*, *Figueroa v. Semple*, No. 3:12-cv-00982 (VAB), 2015 WL 3444319, at *8 (D. Conn. May 28, 2015) (declining to exercise supplemental jurisdiction). Mr. St. Pierre's "claims may be vindicated, if at all, in state court under traditional state law principles." *Giammatteo v. Newton*, 452 Fed. App'x 24, 30 (2d Cir. 2011) (citing *Baker v. McCollan*, 443 U.S. 137, 146 (1979)).

All state law claims asserted, however, are dismissed here.

## IV.    CONCLUSION

For the reasons discussed above, the motion for summary judgment is **GRANTED**.

The Clerk of the Court is instructed to enter judgment in favor of Defendants and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of August, 2018.

    /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE